In the Matter of the Judicial Settlement in the Estate of SMITH BAKER, Deceased.*

FIRST CITIZENS BANK AND TRUST COMPANY OF UTICA (as Successor by Merger to UTICA TRUST AND DEPOSIT COMPANY), as Executor and Trustee, etc., of SMITH BAKER, Deceased, Appellant, Respondent; PHŒBE D. ASHLEY, Life Tenant, and OBERLIN COLLEGE, Remainderman, Respondents, Appellants.

(Second Intermediate Accounting.)

Fourth Department, December 23, 1936.

* See, also, 161 Misc. 562.

*Gilbert R. Hughes,* for the appellant, respondent.

*Arthur N. Gleason,* for the respondents, appellants, Ashley and Oberlin College.

EDGCOMB, J. The First Citizens Bank and Trust Company of Utica (as successor by merger to the Utica Trust and Deposit Company), the executor of the will of Smith Baker, deceased, has filed its account, and has asked that the same be judicially settled. Phœbe D. Ashley, the life beneficiary of a trust created by said will, and Oberlin College, the remainderman, have filed objections, some of which were sustained, and others overruled. Both the executor and the objectors appeal.

The executor attacks two items in the decree wherein it has been surcharged (1) with $560.35, loss sustained by reason of its alleged negligence in failing to promptly dispose of five shares of the preferred stock of the Clayville Knitting Company; (2) with $372.13, commissions alleged to have been unlawfully retained by the executor in connection with the Schneider mortgage participation certificate. The objectors claim error in failing to surcharge the executor (1) with a greater loss by reason of its undue retention of the Clayville stock; (2) with a loss of $576 and interest on six shares of the preferred stock of the Avalon Knitwear Company; (3) with a loss of $1,147.07 and interest on two bonds of the Rockford, Beloit and Janesville Railroad Company; (4) with $105.56, commissions allowed the executor. The objectors also challenge the award of $565.24 to the attorneys for the executor for their services and disbursements in the accounting proceeding.

The above-mentioned securities were owned by decedent at the time of his death. The Clayville stock was inventoried at $500, and was sold by the executor on June 13, 1931, for one dollar per share. The Avalon stock was inventoried at $576, and has never been sold. It has no market value today. The two railroad bonds were inventoried at $1,240, and were sold on July 28, 1928, for $92.93. Neither the Clayville nor the Avalon stock was listed on any exchange. These corporations were local concerns, and their stock was closely held.

A trustee is required to act in perfect good faith, and to give careful attention to the performance of the duties of his trust. He is not a guarantor or insurer of the safety of the estate committed

to his keeping, nor is he expected to be infallible in his judgment or decisions. Like all mortals, he is liable to make mistakes. But he is bound to employ such care and prudence in the management of the estate intrusted him as prudent men of discretion and intelligence employ in their own like affairs. (*Matter of Clark*, 257 N. Y. 132, 136; *Matter of Weston*, 91 id. 502, 511; *McCabe* v. *Fowler*, 84 id. 314, 317; *King* v. *Talbot*, 40 id. 76, 85–87; *Crabb* v. *Young*, 92 id. 56, 66; *Matter of Cady*, 211 App. Div. 373, 375; *Matter of Junkersfeld*, 244 id. 260, 263, 264.) If he fails in the performance of this duty, regardless of his purpose or design, he becomes liable to the estate for his neglect. (*Costello* v. *Costello*, 209 N. Y. 252, 258, 259; *Matter of Cady*, 211 App. Div. 373, 375, 376.)

Section 209 of the Restatement of the Law of Trusts provides as follows: " If the trustee fails to sell trust property which it is his duty to sell, the beneficiary can charge him with the amount which he would have received if he had properly sold the property, with interest thereon."

A distinction must always be borne in mind between the acts of a trustee in making an investment of trust funds, and his failure to promptly dispose of securities received from the donor of the trust. The former might easily constitute negligence, where the latter, regarded prospectively, might be wise and prudent, although in the retrospect it might appear to have been a grievous error. (*Mertz* v. *Guaranty Trust Co.*, 247 N. Y. 137, 144; *Matter of Clark*, 257 id. 132, 136, 137.)

In the instant case there has been a prior accounting, in which these securities were listed, with a notation that the executor had been unable to find a market for them. A decree, judicially settling and allowing that account, was granted on January 11, 1926. All matters embraced within that decree are conclusive against every person of whom jurisdiction was obtained. (Surr. Ct. Act, § 80.) The surrogate, in that proceeding, had jurisdiction to determine the question of the executor's negligence in retaining these securities up to that time, and the present objectors, having failed to charge the executor with negligence, are barred from doing so now, in so far as the conduct of the executor relates to anything which occurred prior to the filing of the first account. (*Matter of Roche*, 259 N. Y. 458.)

A judgment on the merits in one action is final and conclusive as to all matters, either of law or fact, which actually were or legally might have been litigated and decided in a prior action or proceeding between the same parties, or those in privy with them, which, if again considered, would involve an inquiry into the merits of the former judgment. (*Schuylkill Fuel Corp.* v. *Nieberg Realty Corp.*,

250 N. Y. 304, 306, 307; *Barber* v. *Kendall*, 158 id. 401, 405; *Bell* v. *Merrifield*, 109 id. 202, 209; *Pray* v. *Hegeman*, 98 id. 351; *Parisi* v. *Hubbard*, 226 App. Div. 280, 281, 282.)

With these rules in mind a brief reference to the evidence becomes necessary in order to determine whether or not the executor was negligent in not sooner disposing of these securities.

So far as the Clayville stock is concerned, there is evidence of sales in 1926 at prices ranging from 73 to 100, and of other sales in 1930 and 1931 at from 2 to 9. The stock paid a dividend down to December 1, 1926. Upon this evidence the surrogate has found that the executor was guilty of negligence in not sooner disposing of the stock, and has placed the loss to the estate at the difference between the price received when the property was sold in June, 1931, and the price at which it could have been sold in January, 1926, when the market value, as fixed by one sale, was seventy dollars per share.

I think that these facts are sufficient to raise a question of fact as to the negligence of the executor, and that we cannot say that the finding is so far wrong that it should be reversed.

It must be remembered that this stock was not a legal investment for trust funds. There is no provision in the will permitting the executor to invest in non-legals, or to retain indefinitely the non-legal securities which came into its hands. The rule in such a case is well stated in *Matter of Wotton* (59 App. Div. 584; affd., 167 N. Y. 629), where it is said (at p. 587): " When a trustee finds the estate committed to him already invested in interest-bearing securities, we are not inclined to say that it is his absolute duty at once to dispose of them, without regard to the market, or the demand for them, or the ruling price, or the probability of an advance in their value. It is sufficient to say, however, that, ordinarily, if a trustee sees fit to continue such investments after he shall have had a reasonable opportunity to sell them without loss and to invest them in those securities which by law he is authorized to hold, it must be an exceptional case which will justify him in his failure to do so where as a result of that failure there has been a loss."

This same rule relating to prompt liquidation of speculative assets is laid down in *Villard* v. *Villard* (219 N. Y. 482, 499) and *Matter of Hirsch, No. 1* (116 App. Div. 367, 374; affd., 188 N. Y. 584).

Here the executor was appointed on May 14, 1923; it held this stock until June 13, 1931. Eight years is a long time for a trustee to hold a non-legal security which must eventually be sold, when it could have been disposed of for a substantial sum. The executor had ample opportunity to explain its laches, but did not see fit to tell us what effort, if any, it made to sell this stock. The administra-

tion of this estate was under the exclusive management of the executor. The bank was in a far better position to show the peculiar circumstances which induced it to hold this security than were the objectors. They did not possess this information, and they had no means of obtaining it, except as they got it from the executor itself. Under these circumstances, a *prima facie* case of negligence having been made out, it would hardly seem unreasonable to ask the executor, if it seeks to overcome the inference of negligence which might otherwise arise from its conduct, to come forward and frankly disclose what had been done, if anything, in regard to selling this security, and why it chose to adopt the Micawber policy of waiting for something to turn up, and to allow matters to drift on for eight long years, during which time the stock shrunk in value from $100 to $1 per share; and this notwithstanding the fact that the burden of showing negligence rested on the objectors.

It is very true that, unless otherwise prescribed by statute, a corporate executor is subject to no greater liability than that which devolves upon an individual executor. (*Matter of People's Trust Co.*, 169 App. Div. 699, 701.) Nevertheless, a bank has certain advantages over an individual in determining the wisdom of retaining or disposing of securities belonging to an estate. It not only has its trust officer, who is supposed to be more or less familiar with market prices of securities, and whose business it is to be posted concerning market conditions, but over the trust officer are the officials of the bank, and the directors, men of affairs, assumed to be chosen because of their sound business judgment. The advice of these men is at the disposal of the trust officer. Was the advisability of selling this Clayville stock ever brought to the attention of any official of the trustee bank, or to the executive committee, or to the board of directors? The executor has not seen fit to tell us.

As to the Avalon stock and the railroad bonds, a *prima facie* case of negligence was not made out, and the bank can hardly be penalized for failing to tell us what it did, if anything, to dispose of the securities. The finding of the surrogate should not be disturbed.

I now come to the surcharge of $372.13, commissions which the surrogate has found were unlawfully retained by the executor in the Schneider matter.

On December 9, 1924, soon after its appointment, the bank assigned a mortgage of $9,000, which had been given to it by Paul W. Schneider and wife, to itself as trustee. This it had no right to do. In the administration of a trust a trustee must act for the beneficiaries, and not for himself. He cannot sell his individual property to himself as trustee. (*Matter of Long Island Loan &*

*Trust Co.,* 92 App. Div. 1, 4; affd., 179 N. Y. 520.) The bank evidently realized that its act was illegal, because it later reassigned the mortgage to itself individually, and then sold to itself, as trustee, a participating certificate for the whole amount of the mortgage. This, too, was illegal, and the executor frankly concedes that fact.

The interest on the mortgage was paid until November 1, 1931, and the trustee immediately paid it over, less commissions, to the life tenant. Even after Schneider's default the bank continued to send the life tenant an amount equal to the interest, less commissions, up to November, 1933. From then on for a period of nearly two years no payments were made to the life tenant. Thereafter, and before the present account was filed, the executor came to the conclusion that it had no right to issue a participating certificate for the total amount of the Schneider mortgage, and voluntarily, and without any coercion or suggestion on the part of the objectors, canceled the certificate, and paid to itself, as executor, the full amount of the mortgage, and sent the life tenant all the back interest, less commissions. While the trustee had no authority to do what it did, there is no evidence of fraud or willful misconduct on its part. As soon as it discovered that its act was illegal, it voluntarily made good its mistake, and the estate suffered no loss.

Commissions are allowed executors and trustees as compensation for their services in the execution of a trust. In case of gross neglect or unfaithfulness, such commissions may be disallowed. (*Cook* v. *Lowry,* 95 N. Y. 103, 114; *Matter of Matthewson,* 8 App. Div. 8, 12; *Stevens* v. *Melcher,* 152 N. Y. 551, 583.)

The surrogate applied this rule, and denied the executor any compensation for its services, in so far as the Schneider transaction was concerned. This is not a case of gross neglect, or of such unfaithfulness or mismanagement as merits such a severe penalty. I see no reason why the executor should be punished by being denied its commissions when no loss has come to the estate. There was no deliberate intention to injure the life beneficiary or the remainderman, or to deplete the funds of the trust, and no such result has occurred. Under these circumstances the executor should not be denied its commissions. (*Matter of Garrabrant,* 176 App. Div. 186; affd., 220 N. Y. 773.)

What has been said in regard to the trustee's commissions in the Schneider transaction disposes of the objector's claim that no commissions whatever should be allowed the trustee for any services subsequent to the first accounting.

This leaves for consideration the claim of the objectors that no costs should have been allowed the attorneys for the executor. The question of costs is discretionary. (Surr. Ct. Act, § 278.) While

the surrogate would be justified in denying costs upon an accounting to a testamentary trustee who had failed to exercise good faith, or to use reasonable care and diligence in the management of an estate, I feel that in the instant case such a charge cannot be successfully made against this executor. Under these circumstances an appellate court should hesitate to interfere with the surrogate's discretionary power. (*Matter of Richmond*, 63 App. Div. 488, 494.)

For the reasons stated, the decree of the surrogate should be modified in so far as it surcharges the account of the executor with $372.13, the commissions retained by it, and as thus modified affirmed.

All concur. Present — SEARS, P. J., TAYLOR, EDGCOMB, THOMPSON and LEWIS, JJ.

Decree modified on the law and facts in accordance with the opinion and as modified affirmed, without costs of this appeal to either party.